Toomey, J.
This matter came on for trial before the Court, sitting without jury, on March 23, 1998. Evidence, testimonial and documentary, was received, and the parties were afforded an opportunity to submit post-trial memoranda in supplement to the closing arguments they offered at trial. Upon consideration of the evidence and submissions of counsel, this Court now enters the following findings of fact and judgment. [1]
FINDINGS OF FACT
1. On October 10, 1989, Plaintiff James Long (“Long”) was injured at his place of employment while performing the duties of his employment.
2. On December 11, 1989, Dr. Hawkins, retained by the employer’s insurer, examined Long and concluded that Long suffered from “Probable torn medial meniscus, left knee." (Exhibit 1.)
3. On January 2, 1990, Dr. Ferrari performed arthroscopic surgery upon Long’s left knee. That procedure resulted in a post-operative diagnosis by Dr. Ferrari of “Left knee, torn medial meniscus.” (Exhibit 4, p. 8.)
4. On March 31, 1990, Dr. Hawkins again examined Long and confirmed his earlier diagnosis — "Status post torn meniscus, left knee." (Exhibit 2.)
5. From January 1990 through June 1990, Dr. Ferrari monitored Long’s progress and noted Long’s complaints of continuing discomfort in the left knee. (Exhibit 4, pp. 9-14.) Finally, on July 30, 1990, Dr. Ferrari performed a second arthroscopy on Long’s left knee, and his post-operative diagnosis was, “Left knee status post partial medial meniscetemy.” (Exhibit 4, p. 15.)
6. From August 1990 through January 11, 1991, Dr. Ferrari continued to attend to Long and regularly noted that Long’s left knee remained painful. (Exhibit 4, pp. 16-19.) The treatment prescribed by Dr. Ferrari was physical therapy, “as this is the only thing that can be done.” (Exhibit 4, p. 18.)
7. On December 27, 1990, at the request of the employer’s insurer, Dr. Stanton examined Long and reached the following diagnosis — " 1. Medial meniscal tear, treated improved. 2. ACL partial tear. 3. Chondromalacia patella, state uncertain." (Exhibit 3.) Dr. Stanton also concluded that, “I don’t think any further surgeiy is indicated at this time. . . I feel that the patient can return to light duly type of work . . . [with certain restrictions].” Id.
8. In response to that December 27, 1990 observation of Dr. Stanton, the employer’s insurer filed a complaint to discontinue the weekly benefits that Long had theretofor been receiving pursuant to G.L.c. 152 as a consequence of his October 10, 1989, industrial accident. The parties sought to settle that complaint, and, on March 29, 1991, reached agreement, the essence of which was that the insurer was relieved of the obligation to pay weekly benefits to Long in return for Long’s acceptance of a lump-sum payment of $50,000. Long and the insurer also agreed that the lump-sum payment was “in redemption of the liability for all weekly payments now or in the future due me under the Workers’ Compensation Act for all injuries received by me — James Long, Jr. — on or about October 10, 1989 while in the employ of Silva Construction Company.” (Emphasis added.) (Exhibit 5.) The Department of Industrial Accidents approved the settlement. Id.
9. At the time Long entered into the lump-sum agreement, he believed that his injury consisted of a torn medial meniscus in his left knee. Had he known that his injury also included posterolateral rotatory instability, he would not have entered into the agreement.
10. Although there was adduced, at trial, no direct evidence of the insurer’s belief at the time of the agreement as to the nature of Long’s injury, there is clear and convincing circumstantial evidence, and this Court so finds, that the insurer, upon committing to the lump-sum agreement, believed Long’s injury to consist solely of a tom medial meniscus in the left knee.
11. On June 12, 1992, Long, having continued to experience left knee discomfort, consulted again with Dr. Ferrari, who, upon examination of Long, concluded that the left knee was afflicted with “some posterolateral rotatory instability, and it has probably been there all along, not picked up in his earlier history.” (Exhibit 6.) That instability was addressed in a biceps tenodesis procedure, but the attendant “saphenous nerve pain . . . has been a major problem for Mr. Long.” (Exhibit 7.) The instability, subsequent surgeries and continu *26 ing saphenous nerve pain were causally related to the October 10, 1989, industrial accident. (Exhibit 8.)
12. The posterolateral rotatory instability (and its saphenous nerve pain component) is wholly distinct from the tom medial meniscus and other conditions diagnosed by Drs. Hawkins, Stanton, and Ferrari prior to the March 29, 1991, lump-sum agreement between Long and the employer’s insurer.
DISCUSSION
Both parties to the March 29, 1991, lump-sum agreement labored under the misapprehension that Long’s injury, the claim for which the agreement provided settlement, was a torn medial meniscus in the left knee. Neither party was then aware that in addition to the tom medial meniscus, Long’s left knee was also afflicted with posterolateral rotatory instability. Although that instability was occasioned by the same October 10, 1989, incident that gave rise to the torn medial meniscus, the instability was a condition separate and distinct from the tom medial meniscus. Thus, an injury — the instability — of wholly different character existed at the time the injury first diagnosed — the torn medial meniscus — was addressed by the lump-sum agreement. The parties were unaware of the former and aware of the latter. The parties were, accordingly, acting under a mutual mistake of fact when they executed the agreement.
The instant matter is controlled by LaFleur v. C.C. Pierce Co., Inc., 398 Mass. 254 (1986). Drawing a distinction between a mutual mistake as to the unknown consequences of a known injury and a mutual mistake as to an unknown injury, the LaFleur court ruled that the former would not support the rescission of a lump-sum agreement while the latter would permit avoidance of the contract. Id. at 259-260. The instant dispute falls in the latter category. Thus, having found a mutual mistake of fact that permits the voiding of the lump-sum agreement by the party (here, Long) adversely affected by the contract, Jeselsohn v. Park Trust Co., 241 Mass. 388, 392 (1922), the Court’s inquiry turns to whether or not the parties intended, on March 29, 1991, that the agreement ought survive notwithstanding the later discovery of an injury the existence of which was unknown to the parties at the time of their compact.
At bar, there was no persuasive evidence that suggested that the contracting parties intended that the lump-sum agreement was to prevail even after the discovery of a then-existing but unknown injury. The language of the agreement itself — "for all injuries received by me — James Long, Jr." (Exhibit 5) — is indistinguishable from that which LaFleur held did “not clearly or unambiguously indicate that the parties intended to discharge liability for the unknown injury. . .” LaFleur, supra, at 260-61. The Supreme Judicial Court has directed the trial court'to examine the parol evidence to ascertain if such were the intent of the parties. Id. at 261 (listing a number of “factors” to be considered by the trial court in its effort to divine the intentions of the contractors.)
Having measured the proof offered at trial against the LaFleur “factors,” this Court is satisfied by clear and convincing evidence that neither Long nor the employer’s insurer intended the agreement to discharge liability for unknown injuries. The mutual mistake of fact as to the existence of the posterolateral rotatoiy instability in Long’s left knee and the absence of any intent by the parties that the agreement would nevertheless relieve liability for injuries “unknown" because of that mutual mistake requires that the agreement be avoided.
ORDER
Judgment is to enter for the plaintiff on the instant complaint for rescission of the March 29, 1991, lump-sum agreement. The agreement is hereby rescinded, and the matter will be remanded to the Department of Industrial Accidents for its determination of the remaining issues.

The Court regrets the tardiness of this resolution of the trial, but illness prevented an earlier determination of the matter.